1
2
3
4
5
6
7

HULETT HARPER STEWART LLP
BLAKE MUIR HARPER, SBN: 115756
525 B Street, Suite 760
San Diego, CA  92101
Telephone:      (619) 338-1133
Facsimile:      (619) 338-1139
Email:  bmh@hulettharper.com

Attorneys for Plaintiff
[Additional Counsel on Signature Page]

8

**IN THE UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| ROY JOHN GOOD, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>RONALD J. DE LANGE, HUBERT DE PESQUIDOUX, RONALD W. BUCKLY, ANTHONY COLALUCA, JR., THOMAS J. COLEMAN, JEAN-YVES COURTOIS, CAROL G. MILLS, MICHAEL P. RESSNER, TEKELEC, SIRIS CAPITAL GROUP, LLC, TITAN PRIVATE HOLDINGS I, LLC, and TITAN PRIVATE ACQUISITION CORP.,<br><br>Defendants. | CASE NO. **'11 CV 2826 JAH  BGS**<br><br>**VERIFIED CLASS ACTION COMPLAINT**<br><br><br><br><br><br><br><br><br><br><br><br>**JURY DEMAND** |

Plaintiff Roy John Good ("Plaintiff"), on behalf of himself and all others similarly situated, by his attorneys, alleges the following upon information and belief, except as to those allegations pertaining to Plaintiff which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1.      This is a verified shareholder class action complaint on behalf of the holders of the common stock of Tekelec ("Tekelec" or the "Company") against certain officers and/or directors of Tekelec, and other persons and entities (collectively, "Defendants") involved in a proposed transaction through which the Company will be sold to a consortium (the "Proposed Transaction") led by Siris Capital Group, LLC ("Siris") and including affiliates of the ComVest Group, funds and accounts managed by GSO Capital Partners LP, Sankaty Advisors LLC, ZelnickMedia and other Siris limited partners and affiliates (collectively, the "Buyout Group").

2.      As described below, both the value to Tekelec shareholders contemplated in the Proposed Transaction and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other shareholders of the Company.  The Individual Defendants' (as defined herein) conduct constitutes a breach of their fiduciary duties owed to Tekelec's shareholders and a violation of applicable legal standards governing the Individual Defendants' conduct.

3.      For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' violations of their fiduciary duties of loyalty, good faith, and due care.

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 29 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

5.      Venue is proper in this district because Defendant Tekelec is incorporated under the laws of the State of California. Additionally, a substantial portion of the transactions and

1

wrongs complained of herein, including the Defendants' primary participation in the wrongful acts complained of detailed herein, occurred in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

6.      Plaintiff currently holds shares of common stock of Tekelec and has held such shares since prior to the wrongs complained of herein.

7.      Defendant Ronald J. de Lange ("Lange") is the Chief Executive Officer ("CEO"), President, and a director of the Company and has been since May 31, 2011.  Lange joined Tekelec in July 2005 as the president and general manager for their Network Signaling Group and was promoted to executive vice president Global Product Solutions in 2007.

8.      Defendant Hubert de Pesquidoux ("Pesquidoux") has been a director of the Company since May 2009.  Pesquidoux also serves as Chairman of the Board.

9.      Defendant Ronald W. Buckly ("Buckly") has been a director of the Company since 2007.

10.     Defendant Anthony Colaluca, Jr. ("Colaluca") has been a director of the Company since February 2011.

11.     Defendant Thomas J. Coleman ("Coleman") has been a director of the Company since February 2011.

12.     Defendant Jean-Yves Courtois ("Courtois") has been a director of the Company since May 2011.

13.     Defendant Carol G. Mills ("Mills") has been a director of the Company since 2007.

14.     Defendant Michael P. Ressner ("Ressner") has been a director of the Company since 2006.

15.     Defendants Lange, Pesquidoux, Buckly, Colaluca, Coleman, Courtois, Mills, and Ressner are referred to herein as Individual Defendants or the Board.

16.     Tekelec is a corporation that is organized and exists under the laws of the State of

2

California with its principal executive office address at 5200 Paramount Parkway, Morrisville, North Carolina. Tekelec is a provider of core network solutions in the fields of talk, text, and web access. Tekelec is listed on the NASDAQ under the symbol TKLC. Tekelec has a market capitalization of $762.5 million.

17.     Defendant Siris is a private equity firm specializing in the technology, telecommunications, and health-care services industries. Siris was co-founded in 2011 by Frank Baker, Peter Berger, and Jeffrey Hendren.

18.     Defendant Titan Private Holdings I, LLC is a Delaware limited liability company and is an affiliate of Siris.

19.     Defendant Titan Private Acquisition Corp. is a California corporation wholly owned by Titan was created for the purpose of effectuating the Proposed Transaction.

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

20.     By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of Tekelec and owe Plaintiff and the other members of the Class (as defined herein) the duties of good faith, fair dealing and loyalty.

21.     By virtue of their positions as directors and/or officers of Tekelec, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Tekelec to engage in the practices complained of herein.

22.     Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person. In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision. To diligently comply with this duty, the directors of the corporation may not take any action that:

3

(a)     Adversely affects the value provided to the corporation's shareholders;

(b)     Contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)     Discourages or inhibits alternative offers to purchase control of the corporation or its assets; or

(d)     Will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders.

23.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other shareholders of Tekelec, including their duties of loyalty and good faith.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Tekelec common stock and their successors in interest, except Defendants and their affiliates (the "Class").

25.     This action is properly maintainable as a class action.

26.     The Class is so numerous that joinder of all members is impracticable.  As of November 2011, Tekelec had 69.25 million shares of common stock outstanding.  Members of the Class are scattered throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

27.     Questions of law and fact exist that are common to the Class, including, among others:

(a)     Whether the Individual Defendants have fulfilled and are capable of fulfilling their fiduciary duties owed to Plaintiff and the Class;

(b)     Whether the Individual Defendants have engaged and continue to engage in a scheme to benefit themselves at the expense of Tekelec shareholders in violation of their fiduciary duties;

(c)     Whether the Individual Defendants are acting in furtherance of their own self interest to the detriment of the Class; and

4

(d)     Whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein.

28.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

30.     Preliminary and final injunctive relief on behalf of the Class as a whole is entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Tekelec, incorporated in December 1971, is a provider of core network solutions. The Company's solutions purportedly help enable billions of people and devices to talk, text, and access the Web. Its customers include mobile (wireless), fixed (wireline), and cable service providers. It has more than 300 customers in over 100 countries. Its product portfolio includes signaling application platforms that provide full signal transfer point (STP) capabilities and number portability solutions. In addition to these established solutions, its next-generation portfolio, which is enabled by its EAGLE XG middleware, includes applications that provide session and policy management, performance management, and subscriber data management for evolving networks. Its portfolio consists of its EAGLE 5 products, which address signaling and real-time transaction based applications within 3G and prior networks. Its next-generation product

portfolio includes data, within 3G networks. It acquired Camiant and Blueslice in May 2010.

32.      In 2011, Tekelec began a transformation plan to shift its focus from Voice- and Text-Centric Products to Data- and Video-Centric Products.  The Company's Form 10-Q, filed with the SEC on November 7, 2011, stated in relevant part:

> Within developed markets (i.e., the U.S. and Western Europe), we believe our customers are shifting their investments from 2G and 3G networks to investments in their next-generation networks, such as Long Term Evolution ("LTE") and IP Multimedia Subsystem ("IMS"). We believe this shift in investment focus is primarily the result of the slowing growth of voice and text messaging traffic, coupled with substantial growth of data and the associated network capacity requirements, which is outpacing service provider revenues. While the shift in our customers' focus has accelerated the decline in orders for our Voice- and Text-Centric Products, it has resulted in an increase in orders for our Data- and Video-Centric Products.

> * * *

> In response to the changing market dynamics and the decline in orders of our Voice- and Text-Centric Products, we implemented a restructuring and reorganization plan ("the Plan") during the first nine months of 2011 to better align our operating cost structure with our current and expected business opportunities. Upon completion of the Plan, we expect to reduce our annual operating expenses by $25.0 million to $30.0 million. The post restructuring run rate is inclusive of an anticipated shift in investments from our established products to our next-generation solutions.

33.      In order to accomplish this plan, the Company is currently reorganizing its operations into two business segments, Global Signaling Solutions ("GSS") and Broadband Network Solutions ("BNS").  Tekelec's GSS unit will be comprised of the Company's Eagle 5 signaling, performance management, and mobile messaging solutions (the Voice- and Text-Centric Products) and will focus on addressing the voice and text demands of service providers within their 2G and 3G networks.  BNS will consist of Tekelec's next-generation session, policy, and subscriber data management solutions (their Data- and Video-Centric Products) and is focused on developing solutions that manage and monetize mobile data for Tekelec's service provider customers.  The Company is currently in the process of transitioning to this new business unit structure and expects to complete the business reorganization by the end of the fourth quarter 2011.

34.      This reorganization is just starting to show signs of paying off and the Company is

now positioned for tremendous growth.  On November 7, 2011, the Company announced its earnings for the third quarter of 2011.  On a GAAP basis, the Company reported earnings for the quarter of $0.8 million compared to a net loss in the third quarter 2010 of $0.1 million.  On a non-GAAP basis, the Company reported net income for the third quarter of $13.1 million compared to net income of $10.2 million for the third quarter in 2010.  The Company further raised its sales guidance for the remainder of 2011 from a range of $360-$400 million to a range of $395-$410 million.

35.     Orders for the Company's Voice- and Text-Centric products declined by 11% in the first nine months of 2011 as compared to the same periods in 2010.  Orders for the first nine months of 2011 for the Company's Data- and Video-Centric products increased by $12.5 million, or 45%, compared to 2010, primarily due to orders for their Diameter Signaling Router ("DSR") product.  DSR is one of the primary solutions in their session management portfolio.

36.     In a press releasing announcing the Company's 3Q 2011 financial results, Defendant Lange was quoted as saying:

> "We continue to make strides in transforming our Company for a voice- and text-centric business to a data and video focused business.  Our third quarter results highlight the strong profitability and cash flow contributions we expect from our Global Signaling Solutions business unit, while we advance with our next generation session, policy and subscriber data management solutions in the market."

37.     The same press release stated that the Company was already off to a strong start in 4Q 2011.  The Company received a DSR related order in the amount of approximately $20 million in early October 2011, an order that "represents the single largest Broadband Network Solutions order in the Company's history."  The Company received a second DSR related order in the amount of approximately $13 million in late October from another large carrier.  As described in the same press release, the Company "believes these orders demonstrate the continued traction the Company's products are gaining in the early adoption phase of DSR technology."

**The Proposed Transaction**

38.     The Company issued a press release on November 7, 2011, announcing it had entered into a merger agreement with the Buyout Group pursuant to which the Buyout Group will

7

acquire all outstanding shares of the Company at a price of $11.00 per share. The press release stated in relevant part:

> MORRISVILLE, N.C. — November 7, 2011 — Tekelec (NASDAQ: TKLC), the mobile broadband solutions company, announced today that it has entered into a definitive agreement to be acquired by a consortium led by Siris Capital Group, LLC ("Siris") and including affiliates of The ComVest Group, funds and accounts managed by GSO Capital Partners LP, Sankaty Advisors LLC, ZelnickMedia and other Siris limited partners and affiliates. The transaction is valued at approximately $780 million.
>
> Under the terms of the agreement, all outstanding shares of Tekelec's common stock will be acquired for $11.00 per share in cash, representing an 11% premium over the closing price on November 4, 2011, and a 38% premium over the 30 day trading average closing price of Tekelec common stock. The deal is expected to close during the first quarter of 2012, pending shareholder approval, regulatory approvals and customary closing conditions. Tekelec's management team is expected to remain in place, and Merle Gilmore, former President of Motorola's Communications Enterprise and Chairman of the Board of Airvana Network Solutions Inc., will serve as Tekelec's Executive Chairman following the closing.
>
> "Our customers can expect the same level of innovation and quality from our market leading products and our global team," said Ron de Lange, President and CEO of Tekelec. "In addition, the acquisition will provide us even greater flexibility to deliver best-in-class solutions for the mobile data and video market, with an unwavering focus on our global installed base of over 300 customers."
>
> Tekelec's Board of Directors unanimously approved the transaction and recommended that the Company's shareholders approve the transaction. Siris Capital Group, LLC focuses on the technology, telecommunications and healthcare industries. The investor group has secured committed financing, consisting of a combination of equity and debt financing.
>
> "Tekelec presents a unique opportunity to acquire market leading products in the Signaling, Policy, and Diameter Routing markets, a global customer base that includes 16 of the top 20 wireless service providers, and a highly skilled employee workforce," said Merle Gilmore. "We will continue investing in and building on Tekelec's reputation for innovation, scalability and reliability to extend the company's mobile data products to new markets and applications."

39.      The consideration to be paid to the Company's shareholders for their interest in Tekelec is inadequate and materially undervalues the Company. The $11.00 per share offer represents a paltry 11% premium based on the Company's closing price per share of $9.90 per share on November 6, 2011. Further, the Proposed Transaction does not adequately take into account the Company's recent transformation to Data- and Video-Centric products and the promising growth potential of these new products.

8

40.      After evaluating the Proposed Transaction, Northland Capital Markets analyst Catharine Trebnick stated, "The valuation (of the deal) is slightly skewed and there isn't enough accounting for the growth of the new products.  It has been addressed, but not addressed enough."

41.      The Company's new diameter signal router business, which facilitates the ability of phone companies to manage services and applications on 3G and all-IP LTE networks, is growing 45 percent annually.

42.      Catharine Trebnick went on to say, "I definitely think that their next generation product line is very valuable and there might be other competitors who want to look at that."

43.      By announcing the Proposed Transaction in conjunction with the announcement of the Company's very strong financial results for the third quarter 2011, the Company raised guidance for 2011 and announced the new orders it received in October 2011, the Company effectively capped the price Tekelec's stock would have risen as a result of the positive announcement, thereby preventing Tekelec's shareholders from realizing further value as a result of the positive quarter.

44.      Because of the Proposed Transaction, Tekelec shareholders are being unfairly forced to cash out at a time when the Company is experiencing great growth and has bright prospects for its future.   Meanwhile, the Buyout Group will benefit substantially from the Company's current and future growth while paying a premium of merely 11 percent.   The Company affirmed that it expects to continue its current growth path.   In a Frequently Asked Questions document filed by the Company with the SEC in connection with the Proposed Transaction, the Company presented the question, "Why sell now when the company is making great progress on DSR wins and just reported a great quarter?  We expect our business momentum to continue under the new ownership."

45.      In the *Illustrated Discounted Cash Flow Analysis* performed by Goldman Sachs, the Company's financial advisor, a value of $13.40 per share for the Company was presented.  Goldman Sachs also presented an *Illustrative Present Value of Future Share Price Analysis* which yielded a value for the Company of $12.17 per share.

46.      One analyst cited by *Yahoo! Finance* had a target price of $16.00 per share for the

1  Company's stock prior to the Proposed Transaction's announcement.

2  **Self-Dealing by the Individual Defendants**

3      47.      Instead of negotiating a transaction that benefitted the interests of the Company's
4  shareholders, the Individual Defendants have acted in their self-interest by negotiating and
5  approving the Proposed Transaction.

6      48.      On the day the Merger Agreement was announced, November 7, 2011, Defendant
7  Lange, Vice President Gregory Rush ("Rush"), and Vice President and General Counsel Stuart
8  Kupinsky ("Kupinsky") each entered "Summary of Employment and Equity Terms" sheets with
9  Siris providing for, among other things: (a) each officer's employment with Siris following the
10  closing of the Proposed Transaction; (b) the opportunity for each officer to invest in the equity
11  interests of the post-merger company; and (c) the granting of stock options to each officer to
12  acquire common stock of a newly created operating subsidiary that will consist of the Company's
13  growing BNS unit.

14      49.      Lange, Rush, and Kupinsky are each expected to retain their current titles and
15  positions with the post-merger company.  Lange, Rush, and Kupinsky will receive annual base
16  salaries of $465,000, $310,000, and $320,000 respectively.  Further, Lange, Rush, and Kupinsky
17  will be eligible for substantial bonus opportunities with Siris.  As stated in the Preliminary Proxy
18  Statement filed with the SEC on November 21, 2011, Lange, Rush, and Kupinsky will receive the
19  following bonus opportunities:

20
21
22
23

> *Annual Target Cash Bonus Opportunity; Net Cash Collections Bonus*. The annual cash bonus opportunity for Messrs. de Lange, Rush and Kupinsky will be targeted at 100%, 60% and 60%, respectively, of the officer's annual base salary. Each of the officers will also be eligible to receive annual cash bonuses based on net cash collections in the Company's Global Signaling Solutions, or GSS, business unit (the "Cash Collection Bonuses"). The target Cash Collection Bonuses for Messrs. de Lange, Rush and Kupinsky are $600,000, $400,000 and $200,000, respectively.

24

25      50.      In addition, Lange, Rush, and Kupinsky have been given the opportunity to invest
26  in the equity of the post-merger company upon closing of the Proposed Transaction.  Lange will
27  invest $400,000 while Rush and Kupinsky will each invest $50,000 in the equity of the post-
28  merger company following the close of the Proposed Transaction.   At the same time, the

10

Company's shareholders are being forced to cash out their shares and will not be given the opportunity to benefit from their equity interest in the Company while the Company's executives will continue to reap the benefits of Tekelec's growth trajectory.

51.     The Proxy further reveals that:

> At or after the closing of the merger, the Company expects that its Broadband Network Solutions business unit will be separated out into a separate operating subsidiary which is referred to as "BNS." Each officer will be granted a nonqualified stock option to acquire common stock of BNS. Messrs. de Lange, Rush and Kupinsky will be granted options to acquire 1.5%, 0.31% and 0.27%, respectively, of the fully diluted common stock of BNS.

52.     Pursuant to their respective severance agreements with the Company, Lange, Rush, and Kupinsky will also be entitled to receive substantial severance payments in the event of their termination following consummation of a change of control transaction.  Even though Lange, Rush, and Kupinsky have agreed to remain employed with the post-merger company, Siris has agreed to make severance payments to them in the amounts of $2,200,000 to Lange, $928,000 to Rush, and $744,000 to Kupinsky.  As stated in the Proxy:

> On November 6, 2011, Parent and Merger Subsidiary entered into an "Agreement and Intent to Continue Employment" with each of Ronald J. de Lange, our President and Chief Executive Officer, Gregory S. Rush, our Senior Vice President and Chief Financial Officer, and Stuart Kupinsky, our Senior Vice President, Corporate Affairs and General Counsel. Under the terms of these agreements, subject to the closing of the merger and each such officer's execution of an effective release of claims in favor of the Company, within eight days following the merger, Messrs. de Lange, Rush and Kupinsky will receive lump sum payments equal to $2,200,000, $928,000 and $744,000, respectively. Upon receipt of any such payments, Mr. de Lange will have no further rights under the Company's 2011 Officer Severance Plan, and Messrs. Rush and Kupinsky will have no further rights under the Company's 2007 Officer Severance Plan.

53.     The Company's officers and directors also hold restricted stock units that, pursuant to the Merger Agreement, will no longer be subject to restrictions and will convert into the right to receive the Proposed Transaction consideration of $11.00 per share.  The following chart shows in detail the amount and value of the restricted stock units held by the Company's executive officers and directors that they will be able to cash out pursuant to the Merger Agreement with Siris:

11

| | Aggregate Number of Restricted Stock Units | Value of Restricted Stock Units (1) |
|---|---|---|
| **Executive Officers** | | |
| Ronald J. de Lange(2) | 149,946 | $1,649,406 |
| Gregory S. Rush | 56,861 | 625,471 |
| Stuart H. Kupinsky | 57,656 | 634,216 |
| David K. Rice | 57,356 | 630,916 |
| Marykay Wells | 28,261 | 310,871 |
| Douglas A. Suriano | 20,228 | 222,508 |
| Houck S. Reed | 20,128 | 221,408 |
| **Directors** | | |
| Hubert de Pesquidoux | 11,334 | 124,674 |
| Ronald W. Buckly | 8,000 | 88,000 |
| Anthony Colaluca, Jr. | 18,000 | 198,000 |
| Thomas J. Coleman | — | — |
| Jean-Yves Courtois | 18,000 | 198,000 |
| Carol G. Mills | 8,000 | 88,000 |
| Michael P. Ressner | 8,000 | 88,000 |

54.     The Company's executive officers also hold unvested share appreciation rights which will automatically vest pursuant to the terms of the Merger Agreement.  The following chart shows the amount of unvested share appreciation rights held by the Company's executive officers, shares that would continue to remain unvested had the Proposed Transaction not occurred:

| | Unvested Share Appreciation Rights Shares | Value(1) |
|---|---|---|
| **Executive Officers** | | |
| Ronald J. de Lange(2) | 230,300 | $462,142 |
| Gregory S. Rush | 64,000 | 213,760 |
| Stuart H. Kupinsky | 110,500 | 190,380 |
| Houck S. Reed | 18,000 | 60,120 |
| David K. Rice | 110,500 | 190,380 |
| Douglas A. Suriano | 18,000 | 60,120 |
| Marykay Wells | 46,200 | 154,308 |
| Wolrad Claudy(3) | — | — |

55.     The payments made to Defendant Lange are particularly egregious as he has only been the Company's President and CEO since May 31, 2011, less than six (6) months prior to the announcement of the Proposed Transaction.  When appointed as President and CEO, Lange was granted 75,000 shares of the Company's restricted stock.  The restricted stock units were scheduled to vest on May 31, 2015, and were subject to Lange remaining employed with the Company.  Lange was also granted 100,000 share appreciation rights which were scheduled to vest

12

1  in four equal annual installments, with the last installment scheduled to vest in 2015.  Once again,

2  the share appreciation rights were contingent on Lange remaining employed by the Company.  The

3  restricted stock and share appreciation rights will now vest upon the closing of the Proposed

4  Transaction providing Lange with a massive financial windfall which he would otherwise not

5  receive.  In addition, Lange is designated as an "eligible officer" under the Company's 2011

6  Severance Plan, entitling him to substantial severance payments in the event he is terminated

7  without cause or resigns for good reason during the period commencing two (2) months prior and

8  ending eighteen (18) months after a change of control of the Company.  Pursuant to Lange's

9  agreement with Siris described above, Lange will receive the $2.2 million he would be entitled to

10  receive under the severance package.

11  56.      The Merger Agreement also contains provisions relating to the indemnification of

12  and insurance for the Company's directors and officers.  Pursuant to the Merger Agreement, Siris

13  "has agreed that for six years after the effective time of the merger, it will cause the Company to

14  indemnify and hold harmless the Company's and its subsidiaries' present and former directors and

15  officers for acts or omissions occurring at or prior to the effective time of the merger to the fullest

16  extent provided under applicable law. . . ."  This provision is particularly important for four of the

17  Company's directors, Defendants Buckly, Pesquidoux, Ressner, and Mills, as they are currently

18  defendants in a shareholder derivative litigation action that is pending in the United States District

19  Court for the Central District of California (*Dulbert v. Pastine*, Case No. 8:11-cv-00351-JVS-

20  RNB).  The shareholder derivative litigation seeks to recover damages from the defendants in

21  connection with their breaches of fiduciary duties and other violations of law resulting from

22  alleged false and misleading statements that the defendants allowed the Company to disseminate.

23  Accordingly, Defendants Buckly, Pesquidoux, Ressner, and Mills were incentivized to approve the

24  Proposed Transaction to shield them from potential monetary liability as a result of the derivative

25  litigation.

26  57.      As a result of all of these facts, the Proposed Transaction is unfair to Tekelec's

27  public shareholders, and represents an effort by the Individual Defendants to bolster and improve

28  their own financial positions and the interests of Company insiders to the detriment of Tekelec's

13

1  shareholders.

2  **The Flawed Sales Process**

3      58.      Despite the material conflicts of interest of the Company's executive officers, the

4  Company's Board sat idly by and provided no meaningful oversight as Lange, Rush, and

5  Kupinsky ran the sales process and procured for themselves the substantial benefits described

6  above to the detriment of the Company's shareholders.

7      59.      In early December 2010, S.A.C. Private Capital Group, LLC ("SAC PCG"), a

8  private equity fund that was managed by founders of Siris and which owns a controlling interest in

9  Airvana Network Solutions ("ANS"), approached the Company regarding a potential transaction

10  with the Company.

11      60.      On December 10, 2010, SAC PCG wrote the Company a letter to express an

12  interest in discussing a possible all cash acquisition of the Company at a price ranging from $14.50

13  to $16.50 per share. On December 15, 2010, the corporate development committee of the

14  Company's Board of Directors consisting of Krish Prabhu (then the Company's President and

15  CEO), Ressner, Buckly and Pesquidoux met to discuss the letter from SAC PCG. At the meeting

16  the committee advised management that the Company was not for sale or pursuing a sales process.

17  Following the meeting, the Company's management communicated this to SAC PCG.

18      61.      On March 31, 2011, Prabhu notified the Company that he intended to resign from

19  his officer and director positions as soon as the Board found his replacement. On May 31, 2011,

20  the Board appointed Defendant Lange to replace Prabhu as the Company's President and CEO.

21      62.      Almost immediately after, on June 2, 2011, Siris submitted to the Company an

22  indication of interest of a possible all cash acquisition of the Company at a price of $12.00 per

23  share.  This indication of interest was based on the preliminary financial forecast provided on

24  May 19, 2011, which was subsequently revised downward by management on June 13, 2011. The

25  closing sales price of the Company's common stock on June 2, 2011 was $8.76 per share.

26      63.      A few weeks prior, a strategic party ("Party B") had submitted an indication of

27  interest to acquire the Company for $10.75 per share.

28      64.      On May 22, 2011 and June 13, 2011, the Company's Board of Directors met and

discussed the indications of interest and discussions with Siris and Party B. At the June 13th Board meeting the Company's Board also reviewed an updated forecast of the Company's operating results for 2011, 2012 and 2013. Following the meeting, management of the Company provided these updated forecasts to Siris and Party B.

65.     On July 8, 2011, the Company's Board of Directors met and reviewed the latest discussions with Siris and Party B, determining that it was in the best interest of the Company's shareholders to engage a financial advisor to help the Board explore strategic alternatives. On July 20, 2011, the Company engaged Goldman Sachs to assist the Company's Board of Directors with its exploration of possible strategic alternatives and to begin a process to explore a potential sale of all or a portion of the Company.

66.     Despite having decided in December 2010 that the Company was not for sale, with Lange newly at the helm, the Board of Directors forced the Company into a sales process.

67.     There were multiple material conflicts of interest that existed with the Company's senior management in connection with the strategic alternatives process it was undertaking. In connection with the sale of the Company, the executive officers were highly incentivized to favor a private equity firm over a strategic buyer, as strategic buyers often terminate the employment of the target company's executive officers, whereas private equity firms often seek to retain a target company's senior management in connection with the acquisition. If executive officers could secure for themselves lucrative post-transaction arrangements, they would be incentivized to pursue a deal at any price, regardless of how paltry the value was for the Company's shareholders.

68.     In addition, the Company's executive officers and seven (7) of the eight (8) Directors of Tekelec were incentivized to pursue a change of control transaction as opposed to other strategic alternatives due to the substantial restricted stock and/or unvested share appreciation rights held by them, which could immediately vest upon a change of control transaction. Moreover, the Company's financial advisor, Goldman Sachs, was incentivized to ensure that a change of control transaction was consummated based upon the fact that Goldman Sachs' entire $6.7 million fee is contingent upon the Proposed Transaction closing.

69.     Despite these material conflicts, the Board exercised no meaningful oversight of

15

the strategic alternatives process.  A special committee made up of disinterested directors was not appointed to oversee and handle discussions and negotiations with potential buyers.  Rather, the Board left the entire process in the hands of senior management and Goldman Sachs.  As described in detail in the Proxy, the senior management and/or Goldman Sachs conducted everything from the identification of a list of potential parties to contact, through the discussions and negotiations with the interested parties.  The Board, in a near-complete disregard for its duty, received only monthly "briefings" from senior management on the strategic process and their interactions with prospective buyers.

70.     The Board ultimately set up a "Negotiation Committee" made up of Defendants Ressner, Buckly, and Pesquidoux one (1) week prior to the execution of the Merger Agreement and after the Board had already approved moving forward with the Proposed Transaction at a price of $11.00 per share.  There is no indication as to why the Board waited to set up the Negotiation Committee until after all of the major terms of the Merger Agreement had been negotiated.

71.     Ultimately, the Company entered into a transaction with Siri, a private equity firm, that consisted of lucrative arrangements for the Company's officers and directors as described above, including: (a) lucrative employment arrangements for Lange, Rush, and Kupinsky; (b) the opportunity for Lange, Rush, and Kupinsky to invest in the equity of the post-merger Company; (c) the granting of stock options to Lange, Rush, and Kupinsky to acquire common stock of a newly created operating subsidiary that will consist of the Company's growing BNS unit; (d) the payment of substantial severance benefits to Lange, Rush, and Kupinsky under the Company's Severance Plan, despite the fact that Lange, Rush, and Kupinsky's employment with the Company are not being terminated; and (e) substantial payments to the Company's officers and directors resulting from the vesting of previously restricted stock and unvested share appreciation rights.

72.     The interest of Tekelec's shareholders in maximizing the merger consideration was completely buried in the process.  In fact, the Proposed Transaction consideration of $11.00 per share was less than the $14.50 to $16.50 per share price offered by Siris in December 2010, and less than the $12.00 price offered by Siris in June 2011, the offer that led to the initiation of the strategic alternative process.

73.     Further, there is no indication that the Board considered other strategic alternatives aside from selling the Company and divesting shareholders of their equity interest.  Although Goldman Sachs was ostensibly retained to explore "possible strategic alternatives," the Proxy contains no mention of other alternatives considered and/or pursued by the Company other than a sale of the Company.  In fact, in October 2011, a prospective buyer identified as Party F in the Proxy told Goldman Sachs that it was withdrawing their interest in acquiring the Company for a price in the range of $150-$200 million.  The Proxy, however, completely fails to disclose if and when Goldman Sachs communicated Party F's proposal(s) to the Board, whether the Board considered pursuing Party F's proposal(s) to acquire just the GSS business, and what the Board determined with respect to such proposal(s).

**Preclusive Deal Protection Devices**

74.     As part of the Merger Agreement entered between the Company and Siris on November 6, 2011, the Board agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a fait accompli and ensure that no competing offers will emerge for the Company.

75.     The Merger Agreement includes a "no solicitation" provision in § 6.03(a) which bars the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Titan.  This section further demands that the Company terminate any and all prior on-going discussions with other potential acquirers.

76.     In addition, it appears that prospective bidders that entered into non-disclosure agreements with the Company during the sales process may currently be prevented from submitting a bid to acquire the Company.  As stated in the Proxy:

> On October 20, 2011, outside legal counsel for Party D contacted outside legal counsel for the Company, and asked whether the Company would consider waiving the standstill provision contained in Party D's nondisclosure agreement that, among other things, *would effectively prevent Party D from presenting a bid after announcement of an agreement with another party to acquire the Company.* After consultation with the Company, outside legal counsel for the Company notified outside legal counsel for Party D that the Company was not willing to waive the standstill provision. (Emphasis added.)

77.     The Proxy fails to disclose the nature of the standstill provision contained in Party

17

D's nondisclosure agreement that would "effectively prevent Party D from presenting a bid after announcement of an agreement with another party to acquire the Company" and whether other prospective buyers that had signed nondisclosure agreements with the Company had a similar provision.

78.     Pursuant to § 6.03 of the Merger Agreement, if an unsolicited bidder submitted a competing proposal, the Company was forced to notify Titan of the bidder's identify and the terms of the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Titan in order to enter into the competing proposal, it must grant Titan three business days in which the Company must negotiate in good faith with Titan (if Titan so desires) and allow Titan to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid ceases to constitute a superior proposal.   In summary, the Merger Agreement allows Titan access to any rival bidder's information and allows Titan free reign to top a superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Titan and piggy-back upon the due diligence of the foreclosed second bidder.

79.     The Merger Agreement further provides that a termination fee of $15 million must be paid to Titan by Tekelec if the Company decides to pursue any competing offer, thereby essentially requiring that a competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

80.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The Proxy is Materially False and Misleading**

81.     Defendants are withholding material information about the Proposed Transaction

18

1   from Tekelec's shareholders.  The Proxy, which contains a recommendation from the Board that

2   Tekelec's shareholders vote in favor of the Proposed Transaction, contains numerous material

3   omissions and misstatements, in contravention of the Board's duty of candor and full disclosure.

4            Disclosures Concerning the Sales Process

5            82.       The Proxy fails to disclose material information pertaining to the sales process

6   conducted by the company, including information related to the extent which Tekelec's

7   shareholders' interests were cast aside in favor of the Company's officers' and directors' interests.

8   Specifically and without limitation, the Proxy fails to disclosure the following information:

9            a.        The Proxy states that on November 1, 2011, Siris provided de Lange, Rush,

10   and Kupinsky with draft agreements related to their post-closing employment and ownership of

11   equity interests in the post-merger Company.  The Proxy must disclose when Siris first (if prior to

12   November 1, 2011) indicated its intent to provide de Lange, Rush, and Kupinsky with employment

13   and equity opportunities; the nature of all discussions between Siris and representatives of the

14   Company prior to November 1, 2011 regarding such opportunities for the Company's executive

15   officers; and whether any of the other prospective buyers (including parties A through G) offered

16   employment, equity, and other opportunities for senior management of the Company, and if so, the

17   details of their offers.  This information is important in determining whether the Company's

18   officers and directors favored their own interests over that of the Company's shareholders, and

19   Siris over that of other interested parties.

20            b.        The Proxy also fails to disclose how many strategic parties and how many

21   financial buyers were on the list of prospective buyers that Goldman Sachs and the Company

22   reviewed on July 29, 2011; the criteria used by the Board to select the 18 prospective strategic and

23   financial buyers that it instructed Goldman Sachs to contact on July 29, 2011, as well as how many

24   of the 18 prospective buyers were strategic parties and how many were financial parties; and how

25   many of the 11 parties that entered into non-disclosure agreements (as indicated on page 28 of the

26   Proxy) were strategic parties and how many were financial parties.  Again, this information is

27   important in determining whether the Company's officers tilted the sales process in favor of

28   financial equity buyers compared to strategic buyers.

c.      The Proxy also fails to disclose what other strategic alternatives, if any, were considered by the Board and/or Goldman Sachs, and the results of any such discussions, including the pros and cons of each strategic alternative considered, and the reasons they were not pursued.  Again, this information is important in determining whether the Company's executive officers and directors were focused solely on executing a change of control transaction that would provide them with significant benefits that they would most likely not receive had the Company engaged in another type of transaction.

d.      The Proxy states that on October 6, 2011, Party F informed Goldman Sachs that it was withdrawing their interest to buy all of the Company, and instead submitted a proposal to acquire only the GSS business of the Company for a price in the range of $150 to $200 million. The Proxy fails to disclose whether and when Goldman Sachs communicated Party F's new proposal to the Board, whether the Board considered pursuing Party F's proposal to acquire just the GSS business, and if so what the Board determined with respect to such proposal.

e.      The Proxy states numerous times throughout the Background of the Merger section that members of Company "management" were involved in discussions and meetings with Siris and other prospective buyers and updated the Board with respect to such meetings (*see, e.g.*, meetings held between August 9-August 30, 2011, meetings held during the weeks of September 19th, September 26, and October 3, 2011, and meetings held on August 12, 2011 and September 12, 2011).  The Proxy must disclose which members of management participated in such meetings.  This information is important in determining the extent of de Lange, Rush, and Kupinsky's involvement in the sales process.

f.      The Proxy states that after the closing of the Proposed Transaction, "the Company expects that its Broadband Network Solutions business unit will be separated out into a separate operating subsidiary" and that de Lange, Rush, and Kupinsky "will be granted a nonqualified stock option to acquire common stock of BNS."  The Proxy must disclose who made the decision to separate out the Company's BNS unit, when the decision was made, the reasons for the decision, the terms of the separation, and the nature of the discussions and negotiations that led to the granting of stock options in the BNS operating subsidiary to de Lange, Rush, and Kupinsky.

20

83.     The Proxy further fails to disclose the following information pertaining to the sales process and other events leading up to the announcement of the Proposed Transaction:

a.      The Proxy fails to disclose the reasons and factors considered by the corporate development committee of the Board in determining on December 15, 2010 that the Company "was not for sale or pursuing a sales process" following receipt of SAC PCG's expression of interest to acquire the Company for $14.50 to $16.50 per share, and why the Board changed its mind and committed to a sales process within months.

b.      The Proxy fails to disclose the results of the discussion between Party A and members of Company management in February 2011 regarding a potential transaction, and the reasons provided by Party A in late February 2011 that it was not interested in pursuing a transaction with the Company.

c.      The Proxy states that on March 31, 2011, the Board "discussed in detail the expression of interest received from SAC PCG and Party B" but fails to disclose what the Board determined as a result of such discussion, including how they intended to proceed with respect to such expressions of interest.

d.      The Proxy states that in late May 2011, SAC PCG notified the Company that they were no longer interested in purchasing the Company, but just a few days later on June 2, 2011, Siris submitted an indication of interest to acquire the Company for $12.00 per share. The Proxy must reconcile these seemingly ambiguous and/or conflicting statements, given the ties between SAC PCG and Siris.

e.      The Proxy fails to disclose the nature of the discussions with "other prospective strategic buyers" that was discussed by the Board on July 8, 2011.

f.      The Proxy fails to disclose the reasons the Board determined on July 8, 2011 to engage a financial advisor and to pursue a process of exploring strategic alternatives.

g.      The Proxy fails to disclose what were the "concerns around value" that caused five of the parties to withdraw from the sales process.

h.      The Proxy fails to disclose the reasons Party C, a strategic buyer that contacted the Company expressing an interest in acquiring the Company, was not on the list of

parties that were contacted by Goldman Sachs.

        i.      The Proxy fails to disclose the individual values of the six indications of interest that were received by the Company on or about September 8, 2011.

        j.      The Proxy fails to disclose the reasons two of the six parties were not invited to the second round of the process on September 12, 2011.

        k.      The Proxy fails to disclose the reasons Goldman Sachs requested that Party E submit a joint written indication of interest with its financial sponsor parent, and whether the Board and/or other representatives of the Company authorized this request.

        l.      The Proxy fails to disclose Party F's "value range of their initial indication of interest" that it informed Goldman Sachs it could not reach on October 6, 2011.

        m.      The Proxy fails to disclose the reasons provided by Party C on October 13, 2011 for withdrawing from the process.

        n.      The Proxy fails to disclose the nature of the standstill provision contained in Party D's nondisclosure agreement that would "effectively prevent Party D from presenting a bid after announcement of an agreement with another party to acquire the Company," the reasons the Company was not willing to waive the standstill provision as requested by Party D on October 20, 2011, and whether other prospective buyers that had signed nondisclosure agreements with the Company had a similar provision.

        o.      The Proxy fails to disclose the results of the negotiations with the fourth prospective buyer (other than Siris, Party D, and Party F) that was invited to the second round of the process.

        p.      The Proxy fails to disclose what were the "timing and value expectations" that caused Party D to withdraw their interest in acquiring the Company as indicated to the Company on October 27, 2011, November 1, 2011, and November 5, 2011.

        q.      The Proxy fails to disclose the reasons the Board deemed it necessary to form a "negotiating committee" on October 29, 2011 and why it waited so long to form such a committee.

        r.      The Proxy states that on October 29, 2011, Goldman Sachs informed Siris

that the Company "would be willing to move forward at a price of $11.00 per share, provided that Siris improved certain terms of the merger agreement," but fails to disclose which terms and whether Siris ultimately improved those terms.

s.      The Proxy fails to disclose whether Party G was a strategic or financial party, the reasons they were not on the original list of parties contacted by Goldman Sachs, and the reasons Party G did not execute a nondisclosure agreement.

t.      The Proxy fails to disclose the amount of compensation received by Goldman Sachs for services provided to certain members of the Buyout Group, as indicated on page 42 of the Proxy.

u.      The Proxy states that Goldman Sachs "may have co-invested with [certain investors from the Buyout Group] and their respective affiliates from time to time and may have invested in limited partnership units or other equity interests of affiliates of [certain investors from the Buyout Group] and their respective affiliates from time to time," but fails to disclose the terms of such investments, if any.

Disclosures Concerning the Company's Financial Forecasts

84.      The Proxy fails to disclose material information concerning the financial forecasts of Tekelec that were prepared by Tekelec management and used by Goldman Sachs in its various financial analyses.  Specifically, the Proxy should have disclosed the following items for years 2011 through 2020, but failed to do so:

a.      EBIT (or D&A);

b.      Stock based compensation;

c.      Changes in working capital;

d.      Capital expenditures; and

e.      Unlevered free cash flow.

85.      The Proxy should further disclose the forecasts of the benefits that the Company will receive for years 2012 through 2020 for its $182.6 million net operating loss balance.

86.      In addition, the Proxy should disclose the assumptions used by management to prepare the Company's projections.

23

87.     The Proxy states that the Company's financial forecasts were "revised downward by management on June 13, 2011," but completely fails to reveal the nature and reasons for the revisions.   In addition, the Proxy states that the set of projections that were ultimately used by Goldman Sachs were prepared by management in October 2011, but fails to disclose the difference between the June 13, 2011 projections and the October projections.

Disclosures Related to Goldman Sachs' Financial Analyses and Opinion Regarding the Value of the Company

88.     The Proxy further fails to make disclosures regarding data and inputs underlying the financial analyses supporting the fairness opinion of the Board's financial advisor, Goldman Sachs, including:

a.     with respect to the *Selected Companies Analysis*:

   i.     the criteria used to determine which companies were considered "similar" to the Company;

   ii.     the multiples and ratios observed for each of the comparable companies; and

   iii.     the conclusions drawn by Goldman Sachs from the analysis.

b.     with respect to the *Illustrative Present Value of Future Share Price Analysis*:

   i.     the criteria used to select to the adjusted EPS multiples of 9.0x to 13.0x in the analysis; and

   ii.     the implied value of the Company's common stock calculated for year 2015.

c.     with respect to the *Illustrative Discounted Cash Flow Analysis*:

   i.     the criteria used to select the terminal value multiples of 0.0x to 2.0x for the Company's GSS business and perpetuity growth rates of 1.0% to 5.0% for the Company's BNS business;

   ii.     the weighted average cost of capital derived for Tekelec's GSS and BNS business units which were used in selecting discount rate ranges in the analysis; and

iii.     the individual implied present values and per share ranges calculated for each of the GSS business unit, the BNS business unit, and the Company's net operating losses. This is particularly important in determining whether the Company could have achieved more value for their shareholders in selling the GSS business unit to Party F rather than proceed with the Proposed Transaction; and

iv.     the definition of "free cash flows" used by Goldman Sachs in the analysis.

d.     the reasons Goldman Sachs did not conduct a selected transactions analysis comparing the Proposed Transaction with comparable transactions.

89.     As a result, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

### FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

90.     Plaintiff repeats and realleges each allegation set forth herein.

91.     The Individual Defendants have violated fiduciary duties of care, loyalty, and good faith owed to shareholders of Tekelec.

92.     By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Tekelec.

93.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Tekelec.

94.     The Individual Defendants dominate and control the business and corporate affairs of Tekelec, and are in possession of private corporate information concerning Tekelec's assets, business, and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the shareholders of Tekelec which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

95.     By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

96.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Tekelec's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

97.     Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

98.     Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

**On Behalf of Plaintiff and the Class Against Tekelec, Titan Private Holdings I, LLC and Titan Private Acquisitions Corp. for Aiding and Abetting the Individual Defendants' Breach of Fiduciary Duty**

99.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.     Tekelec, Titan Private Holdings I, LLC and Titan Private Acquisitions Corp. have acted and are acting with knowledge of or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Tekelec's shareholders, and have participated in such breaches of fiduciary duties.

101.     Tekelec, Titan Private Holdings I, LLC and Titan Private Acquisitions Corp. knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Tekelec, Titan Private Holdings I, LLC and Titan Private Acquisitions Corp. rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Buyout in breach of their fiduciary duties.

102.     Plaintiff has no adequate remedy at law.

### THIRD CAUSE OF ACTION

### Against All Defendants for Violation of Section 14(a) of the Exchange Act

103.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Proxy violated § 14(a) and Rule 14a-9 because it omitted material facts regarding the Proposed Transaction.

105.     The Proxy was false and misleading when issued because it fails to disclose material information pertaining to the sales process and other events leading up to the announcement of the Proposed Transaction.

106.     In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxy were materially false and misleading.

107.     The misrepresentations and omissions in the Proxy were material and were made in furtherance of Defendants attempts to continue their violations of their fiduciary duties, as revelations of the truth would have immediately thwarted the Proposed Transaction.

108.     The Company was damaged, and continues to be damaged, as a result the material misrepresentations and omissions in the Proxy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants as follows:

A.     Declaring that this action is properly maintainable as a Class action and certifying Plaintiff as Class representative;

B.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a Proposed Transaction agreement

1  providing the best possible terms for shareholders;

2        C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of

3  the terms thereof, or granting Plaintiff and the Class rescissory damages;

4        D.      Directing the Individual Defendants to account to Plaintiff and the Class for all

5  damages suffered as a result of the Individual Defendants' wrongdoing;

6        E.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

7  attorneys' and experts' fees; and

8        F.      Granting such other and further equitable relief as this Court may deem just and

9  proper.

10                              **JURY DEMAND**

11        Plaintiff demands a trial by jury.

12  DATED: December 2, 2011              HULETT HARPER STEWART LLP
                                        BLAKE MUIR HARPER
13

14
                                         */s/ Blake Muir Harper*
15                                      BLAKE MUIR HARPER

16                                      525 B Street, Suite 760
                                        San Diego, CA  92101
17                                      Telephone:     (619) 338-1133
                                        Facsimile:     (619) 338-1139
18

19                                      FEDERMAN & SHERWOOD
                                        WILLIAM B. FEDERMAN
20                                      10205 North Pennsylvania Avenue
                                        Oklahoma City, OK  73008
21                                      Telephone:     (405) 235-1560
                                        Facsimile:     (405) 239-2112
22                                      Email: wbf@federmanlaw.com
                                                    jdw@federmanlaw.com
23

24                                      Attorneys for Plaintiffs

25

26

27

28

                                        28